CONNIE JO TAFLINGER *v.* STATE OF INDIANA.

[No. 2-473A105. Filed December 30, 1974.]

*John V. Hampton,* of Muncie, for appellant.

*Theodore L. Sendak,* Attorney General, *Eric L. Wyndham,* Deputy Attorney General, for appellee.

WHITE, J.—Appellant appeals from a sentence of imprisonment for a term of one year to ten years upon conviction by jury of sale[1] of a dangerous drug.[2] The only contentions of error relied on for reversal are (1) that evidence was errone-

---

1. The Indiana Dangerous Drug Act (IC 1971, 16-6-8-1 *et seq.,* Ind. Ann. Stat. § 35-3331 [Burns 1974 Supp.] *et seq.,*) defines "sale" by its § 35-3332(h) to include "giving".

2. Ind. Ann. Stat. § 35-3332(j) defines a "dangerous drug" as ". . . any drug the label of which is required by federal law to bear the statement: 'Caution: Federal law prohibits dispensing without a prescription' ". Defendant tacitly concedes that "Quaalude", the substance she is charged with selling, is a dangerous drug by that definition.

ously admitted over appellant's objection and (2) that the evidence was not sufficient to sustain the verdict. We affirm.

The evidence discloses without conflict or question[3] that appellant gave to a State Police undercover officer a pill identical in appearance to a pill she simultaneously gave to his companion. The companion then gave his pill to the officer who put both into the same vial and was thereafter unable to distinguish one from the other.

At the time she gave these pills to the two men she identified them as "quads" which is the street name of "quandadil" which is another name for "quaalude". When appellant first offered the pills as "quads" the trooper thought appellant meant that they were barbiturates. He did not know the difference between "quads" and barbiturates, but knew that both were "downers" and she had described these pills as very good downers that were out of sight and would really mess their minds up.

The trooper took both pills to his home and ran a presumptive type field test on them and got what he thought was a positive reaction for barbiturates. He then put them in a lock box and locked them in a desk to which only he had access. Later on he removed them from the desk and took them to the State Police Laboratory where he handed them over to a chemist. The chemist marked the package for identification and placed it in the evidence lockup until it could be tested, at which time he removed it and ran a test on one of the pills which definitely established that it was "quaalude", but which also entirely consumed the pill. The other pill was untested and remained in the lockup until the chemist removed it and brought it to the trial where he identified it and it was admitted into evidence.

With respect to the pill received into evidence, the State Police chemist testified:

3. Defendant offered no evidence.

"Q. Now, Mr. Forbes, you testified that you, how many tablets were there when you received this particular exhibit?

"A. Two Tablets.

"Q. Alright. And can you tell, is there any similarities between the two?

"A. Yes. They were both the same size. They were both white. They were both marked Rorer, which is the name of the manufacturer.

"Q. And do you have an opinion as to what that particular substance is?

"A. I have an opinion, but it was based upon suspicions.

"Q. Would it be based upon similarities between that item and the item tested?

"A. Yes.

"Q. OK. And what would that be?

"A. That this is also quaalude."

The chemist also testified that quaalude is not a barbiturate, that it has a completely different chemical composition, and would not give the same reaction to a field test for barbiturates. He further testified:

"Q. Do you have an opinion as to whether or not the results of a test on quaalude would be similar to test results on a barbiturate?

"A. There are a number of chemical structures which give, what we call false positive to the —————————, which is the presumptive test for barbiturates. This could be one of them although I did not note it when I examined it myself.

"Q. You have never made a comparison, then of this particular test on quaalude and barbiturates, then right?

"A. Yes, I have made the test, but, uh, when I made it, I made note that there was essentially no reactions as far as I was concerned. Uh, in this manner, there would, uh.

"Q. Is it possible that a test on a quaalude tablet would give the same, show up the same in a limited test as a barbiturate?

"A. I think that would mainly depend upon the experience of the person running the test.

"Q. I see.

"A. I think if he had any experience in running preliminary examinations, he could, uh determine whether it was a false positive or an actual positive.

"Q. I see. What is a false positive?

"A. Well there are a number of color tests which give colors which are close to the type of positive reaction we are talking about. But after you do several hundred or several thousands of these, you can tell the difference. Uh, they are minute differences, uh, mainly based upon the reaction time which the color takes to develop and the complete vividness of the color.

"Q. So, hypothetically speaking, then a test on a barb and a barbituary test on quaalude might both produce a color blue that the barbituary would be more vivid.

"A. It is a violet color.

"Q. I mean it would be up to the decision of the testor based upon his experience, as to whether or not it

"A. Yes, of course, its only a preliminary examination anyway and it doesn't really mean anything."

The foregoing testimony reveals that there is a possibility that the pill which was laboratory tested by the State Police chemist was not the pill given by her to the trooper's companion. There is also the possibility that even though the pill so tested was correctly identified by the chemist as quaalude the other pill was not quaalude. Those possibilities may not be too remote to create reasonable doubt of appellant's guilt in the minds of many reasonable persons. But even if that be true, the evidence of defendant's guilt is nevertheless substantial and of probative value. The rule of reasonable doubt in such cases is for the guidance of the trial judge and jury in weighing the evidence. *Wincel* v. *State* (1968), 251 Ind. 498, 500, 242 N.E.2d 508, 509, 16 Ind. Dec. 262, 263. "This court has upon it a duty to consider, not to weigh the evidence in the case for the purpose of determining whether there is any substantial evidence of

probative value from which a jury reasonably could have inferred that the appellant was guilty of the offense charged." *Robinson* v. *State* (1962), 243 Ind. 192, 197, 184 N.E.2d 16, 18.

Whether the pill which was not laboratory tested should have been admitted into evidence is a question of little relevance at best. Had it not been offered, or having been offered had it not been admitted, the State's *prima facie* case would nevertheless have been complete. It was the chemical composition of the substance sold, i.e., the fact that it was a dangerous drug, not its external appearance, which was essential to the case. *Pryor* v. *State* (1973), 260 Ind. 408, 296 N.E.2d 125, 36 Ind. Dec. 484. The production of either pill in court was no more necessary than would be the production of a stolen automobile in a theft case or a dead human body in a murder case. See *Mayes* v. *State* (1974), 162 Ind. App. 186, 318 N.E.2d 811, 817, 44 Ind. Dec. 496, 504, and cases therein cited and discussed. Compare: *Keiton* v. *State* (1968), 250 Ind. 294, 301, 235 N.E.2d 695, 698, 14 Ind. Dec. 51; *Luckett* v. *State* (1974), 162 Ind. App. 603, 319 N.E.2d 882, 45 Ind. Dec. 213.

The basis of the objection to the offer of the pill into evidence was that the State's witness could not identify it. This alleged failure of identification is argued as both a failure to prove to which person this particular pill was given and a failure to prove that it contained quaalude. What we have already said with respect to the sufficiency of the evidence answers those arguments. The "chain-of-custody" was established to a degree sufficient to satisfy the standards followed in such cases as *Spright* v. *State* (1970), 254 Ind. 420, 260 N.E.2d 770, 22 Ind. Dec. 219; *Kolb* v. *State* (1972), 258 Ind. 469, 282 N.E.2d 541, 30 Ind. Dec. 645; *Butler* v. *State* (1972), 154 Ind. App. 361, 289 N.E.2d 772, 34 Ind. Dec. 72; *Kelley* v. *State* (1974), 161 Ind. App. 253, 315 N.E.2d 382, 43 Ind. Dec. 298.

·The· judgment is affirmed.

Sullivan, P.J., and Buchanan, J., concur.

NOTE.—Reported at 320 N.E.2d 775.